<u>**NOT FOR PUBLICATION**</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| THERESA JONES,<br><br>  *Plaintiff,*<br><br>v.<br><br>COMMISSIONER OF SOCIAL<br><br>SECURITY,<br><br>  *Defendant.* | Civil Action No. 17-04691<br>OPINION |

**ARLEO, UNITED STATES DISTRICT JUDGE**

  **THIS MATTER** comes before the Court on <u>pro se</u> Plaintiff Theresa Jones's ("Plaintiff" or "Jones") request for review of Administrative Law Judge Kimberly F. Schiro's ("Judge Schiro" or the "ALJ") decision regarding Plaintiff's application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"), pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g).  ECF No. 15.  For the reasons set forth in this Opinion, the Commissioner of Social Security's (the "Commissioner") decision is **AFFIRMED**.

**I.**  **STANDARD OF REVIEW AND APPLICABLE LAW**

  **A. Standard of Review**

  This Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g).  The Commissioner's application of legal precepts is subject to plenary review, but the Commissioner's factual findings must be affirmed if they are supported by substantial evidence.

1

Markle v. Barnhart, 324 F.3d 182, 187 (3d Cir. 2003).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate."  Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)); see also McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004) (explaining that substantial evidence "need not rise to the level of a preponderance").

"[T]he substantial evidence standard is a deferential standard of review."  Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).  Accordingly, the standard places a significant limit on the district court's scope of review: it prohibits the reviewing court from "weigh[ing] the evidence or substitut[ing] its conclusions for those of the fact-finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).  Even if this Court would have decided the matter differently, it is bound by the ALJ's findings of fact so long as they are supported by substantial evidence.  Hagans v. Comm'r of Soc. Sec., 694 F.3d 287, 292 (3d Cir. 2012).

In determining whether there is substantial evidence to support the Commissioner's decision, the Court must consider: "(1) the objective medical facts; (2) the diagnoses and expert opinions of treating and examining physicians on subsidiary questions of fact; (3) subjective evidence of pain testified to by the [Plaintiff] and corroborated by family and neighbors; and (4) the [Plaintiff's] educational background, work history, and present age."  Holley v. Colvin, 975 F. Supp. 2d 467, 475 (D.N.J. 2013), aff'd 590 F. App'x 167 (3d Cir. 2014).

### B. The Five-Step Disability Test

Under the Social Security Act ("the Act"), a disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416(i)(1).  To determine whether a claimant is

disabled under the Act, the Commissioner applies a five-step test. 20 C.F.R. § 416.920. First, the Commissioner must determine whether the claimant is currently engaging in "substantial gainful activity." Id. "Substantial gainful activity" is work activity involving physical or mental activities that are "usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 416.972. If the claimant is engaged in substantial gainful activity, then she is not disabled, and the inquiry ends. Jones, 364 F.3d at 503.

Alternatively, if the Commissioner determines that the claimant is not engaged in substantial gainful activity, then the analysis proceeds to the second step: whether the claimed impairment or combination of impairments is "severe." 20 C.F.R. § 416.905(a). The regulations provide that a severe impairment is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). If the claimed impairment or combination of impairments is not severe, the inquiry ends, and benefits must be denied. See id.

At the third step, the Commissioner must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404 Subpart P Appendix 1. 20 C.F.R. § 416.920(d). If so, a disability is conclusively established, and the claimant is entitled to benefits. Jones, 364 F.3d at 503. If not, the analysis proceeds.

Prior to the fourth step, the Commissioner must determine the claimant's residual functional capacity ("RFC") to perform work activities despite the limitations from the claimant's impairments. 20 C.F.R. §§ 416.920(e); 416.945. In considering a claimant's RFC, the Commissioner must consider "all the relevant medical and other evidence" in the claimant's record. 20 C.F.R. § 416.920(e). Then, at step four, the Commissioner must decide if the claimant

has the RFC to perform her past relevant work. 20 C.F.R. §416.920(f). If so, then the claim for benefits must be denied. 20 C.F.R. § 416.960(b)(3).

Finally, at the fifth step, if the claimant is unable to engage in past relevant work, the Commissioner must ask whether "work exists in significant numbers in the national economy that [the claimant] can do, given her residual functional capacity and vocational factors." 20 C.F.R. § 416.960(c). The claimant bears the burden of establishing steps one through four. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987). The burden of proof shifts to the Commissioner at step five. Id.

## II.  BACKGROUND

### A.  General Background

Plaintiff applied for SSI and DIB in 2013, when she was 47 years old. See Administrative Transcript ("Tr.") 19–22. Plaintiff alleged disability due to cardiomyopathy, chronic heart failure, hypertension, diabetes, and asthma. Tr. 19. Plaintiff completed two years of college and received a degree in licensed practical nursing and has relevant work experience as a licensed practical nurse. Tr. 22.

On February 28, 2011, Plaintiff was diagnosed with congestive heart failure exacerbation, asthma, hypertension, and obesity when she appeared at Newark Beth Israel Hospital complaining of shortness of breath. Tr. 197–200. On May 11, 2011, Plaintiff returned to Newark Beth Israel again complaining of shortness of breath. Tr. 456–59. During this hospital stay, an echocardiogram revealed a severely reduced left ventricle systolic function with an ejection fraction of approximately 15-20%.[1] Tr. 390. Plaintiff therefore underwent a cardiac

---

[1] Ejection fraction readings typically measure how much oxygen-rich blood is pumped out of the heart. A 30% ejection fraction percentage is the "moderately abnormal category," whereas anything below 30% is severely abnormal. See generally DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 582, 740 (32d ed. 2012).

catheterization to improve her cardiac condition.[2]  Tr. 218.  The cardiac catheterization was a success; Plaintiff's echocardiogram readings in November 2012 and May 2013 showed "marked improvement" with ejection fraction readings ranging from 40–45%.  See Tr. 241–42, 307–08.  Plaintiff's hypertension and diabetes were also under control at this time.  Tr. 265.

On September 17, 2013, Dr. Hector Rubinstein, M.D. ("Dr. Rubinstein"), performed a consultative examination in connection with Plaintiff's disability claim.  Tr. 218.  Dr. Rubinstein diagnosed Plaintiff with (1) dilated non-ischemic cardiomyopathy, with an ejection fraction reading of 35%; (2) non-insulin dependent diabetes; and (3) hypertension.  Tr. 218–20.  Though Dr. Rubinstein concluded that the claimant's long-term prognosis was "poor," he found that the claimant's range of motion was standard, she was autonomous, and she was able to complete most activities of daily living.  Tr. 219-20.

In October 2013, Plaintiff went to the emergency room on two separate occasions, again complaining of shortness of breath and wheezing.  Tr. 227.  Plaintiff was assessed with asthma-related wheezing and was discharged in an improved condition after both visits.  Tr. 229.  Notably, during these hospital stays, Plaintiff's ejection fraction remained around 40–45% and showed marked improvement in left ventricle function.  Tr. 242.

In June 2014, Plaintiff was assessed with severe COPD, but was noted to be "doing well."  Tr. 609.  In July 2014 at a routine cardiology follow-up appointment, Plaintiff's ejection fraction rating was 45%, and her condition was described as "euvolemic"[3] with a New York Heart

---

[2] A cardiac catheterization is a medical procedure used to diagnose and treat various heart conditions in which a thin, hollow tube is guided through a blood vessel to the heart.  Cardiac catheterizations are often used to repair heart defects and replace heart valves.  See What Is Cardiac Catheterization, THE NATIONAL HEART LUNG AND BLOOD INSTITUTE (March 24, 2022) https://www.nhlbi.nih.gov/health/cardiac-catheterization (last visited Oct. 25, 2023).

[3] Euvolemic is defined as having "appropriate hydration (neither excessively hydrated nor dehydrated)."  TABER'S CYCLOPEDIC MEDICAL DICTIONARY 817 (21st ed. 2009).

Association ("NYHA") class of I to II. Tr. 605.[4] In October 2014, Plaintiff's blood sugar, HgA1C, and blood pressure were under control. Tr. 511–12. In December 2014, Plaintiff reported she was "doing well," and only using her inhaler and nebulizer once a day. Tr. 587. While Plaintiff reported she had sleep apnea, she was able to sleep without using a CPAP device. Id. Similarly, in January 2015 at a follow-up examination, Plaintiff reported that she was walking two to three blocks several times a week. Tr. 505.

On March 29, 2015, Plaintiff appeared in the emergency room at Newark Beth Israel for chest pain radiating into her left arm. Tr. 690. While Plaintiff's stress test showed evidence of possible ischemia of the anteroseptal wall and cardiomyopathy, it also showed an average exercise capacity (achieving 10.4 METS). Id. In addition, Plaintiff's cardiac CAT scan showed no significant coronary heart disease, but confirmed Plaintiff's mild left ventricular hypertrophy, mild left ventricular dilatation, mild diffused left ventricle hypokinesis, and mildly reduced ejection fraction. Tr. 701. An echocardiogram showed an ejection fraction reading of 40–45%. Id.

Plaintiff was last insured on March 31, 2015. Medical records indicate that on April 9, 2015, Plaintiff was again diagnosed with mild sleep apnea, and on April 18, 2015, Plaintiff was diagnosed with non-ischemic cardiomyopathy. Tr. 484.

### B. Procedural History

On August 1, 2013, Plaintiff filed applications for DIB and SSI, alleging disability beginning December 16, 2010. Tr. 116–24. Her claims were initially denied on September 24, 2013, and again on November 12, 2013. Tr. 57–73. After requesting a hearing, Plaintiff testified before the ALJ on April 7, 2015. Tr. 31–56. On July 23, 2015, the ALJ issued a decision finding

---

[4] NYHA class I indicates no symptoms and no limitations in ordinary physical activity, e.g., shortness of breath when walking, climbing stairs, etc., and NYHA class II indicates mild symptoms (mild shortness of breath and/or angina) and slight limitation during ordinary activity. What are the Stages of Heart Failure, HEALTH UNION (Dec. 9, 2019) www.heart-failure.net/stages (last visited Oct. 26, 2023).

that Plaintiff was not disabled under the Act. Tr. 17–23. On February 21, 2017, the Appeals Council denied Plaintiff's request for review. Tr. 1–3. Plaintiff thereafter appealed the decision to this Court. ECF No. 1. This Action followed.

### C. The ALJ's Decision

Using the five-step framework the ALJ determined that Plaintiff was not disabled prior to March 31, 2015, her date of last insured. See Tr. 14–23. At step one, the ALJ found that Plaintiff did not engage in substantial gainful activity from December 16, 2010, through March 31, 2015. Tr. 19. At step two, the ALJ found Plaintiff had the following severe impairments that significantly limited Plaintiff's ability to perform basic work activities: (1) hypertrophic cardiomyopathy, (2) non-insulin dependent diabetes mellitus, (3) hypertension, (4) asthma, and (5) obesity. Id.

At step three, the ALJ found that none of Plaintiff's impairments, individually or collectively, met or medically equaled the criteria of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. In making this finding, the ALJ focused on Section 4.04 of the Listings, which defines and describes "ischemic heart disease."[5] Id. The ALJ concluded that, throughout the relevant period, Plaintiff's condition did not meet or medically equal Section 4.04 for two reasons. First, Plaintiff was diagnosed with a non-ischemic form of heart disease, not ischemic heart disease. Tr. 19.[6] Second, Plaintiff did not show she had "very serious limitations in the ability to . . . complete activities of daily living." Id.

---

[5] Listing 4.04C specifically requires the Plaintiff to show that she was diagnosed with coronary artery disease, as demonstrated by angiography or other appropriate medically acceptable imaging. In addition to showing coronary artery disease Plaintiff must also demonstrate that she has "very serious limitations in the ability to independently initiate, sustain or complete activities of daily living." See 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 4.04 (C).

[6] Ischemic cardiomyopathy is a type of dilated cardiomyopathy. Non-ischemic cardiomyopathy is any form of cardiomyopathy not related to coronary artery disease. See AURORA HEALTHCARE, What is Ischemic Cardiomyopathy, available at: https://www.aurorahealthcare.org/services/heart-vascular/conditions/ischemic-cardiomyopathy.

Before proceeding to step four, the ALJ found that Plaintiff had the RFC to perform sedentary work[7] as defined in 20 CFR 404.1567(a) with several limitations.[8] Tr. 20. In making this finding, the ALJ considered Plaintiff's medical records and subjective testimony. See id. First, the ALJ engaged in a lengthy discussion of Plaintiff's medical history. During this discussion, the ALJ noted that while Plaintiff has several severe conditions, these conditions were largely controlled with medication. Id. In addition, the ALJ assigned "great weight" to the opinion of consultative internist Dr. Rubinstein. Tr. 22. Dr. Rubinstein confirmed that the cardiac catheterization substantially improved Plaintiff's overall cardiac function. Further, Dr. Rubinstein found that while Plaintiff's long-term prognosis was "poor," Plaintiff's range of motion was standard, and that she was autonomous and able to complete activities of daily living. Id.

Moreover, the ALJ reviewed Plaintiff's own testimony. Plaintiff indicated that she was able to complete many activities of daily living, which include: (1) cooking, (2) feeding and bathing her dog, (3) cleaning, (4) performing yard work, and (4) leaving the house for social occasions. See Tr. 20. The ALJ found that, based on this evidence, Plaintiff can complete sedentary work, albeit with restrictions.

At step four, the ALJ determined that Plaintiff is unable to perform past relevant work as a licensed practical nurse as generally performed because it exceeds Plaintiff's RFC determination. Tr. 22. Because the ALJ found that Plaintiff is unable to perform past relevant work, the analysis proceeded to the fifth and last step. At step five, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform given her RFC and

---

[7] Sedentary work involves primarily seated activity and lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. § 404.1567.

[8] These limitations include not having concentrated exposure to temperature extremes, wetness, humidity, fumes, odors, dusts, gases, and poor ventilation. Tr. 20–22. Plaintiff also was restricted from climbing ladders, ropes, and scaffolds, as well as working around hazards (defined as moving mechanical parts or at unprotected heights). Id.

additional restrictions. Tr. 22. The ALJ came to this determination by consulting the relevant GRID Rule 201.28,[9] which directed a finding of not disabled. The ALJ therefore found that Plaintiff was not disabled from December 16, 2010, through March 31, 2015, her date last insured. Tr. 23.

### III. ANALYSIS

Plaintiff urges the Court to reverse the Commissioner's final administrative decision and order the payment of benefits, or in the alternative, vacate and remand the ALJ's decision for further administrative proceedings. See ECF No. 15. Plaintiff argues that: (1) her RFC determination is not supported by substantial evidence,[10] and (2) the ALJ should have considered her health deterioration after the date she was last insured. The Court addresses each argument in turn.

#### A. Plaintiff's RFC Determination

Plaintiff mainly disputes her RFC determination. See generally ECF No. 15 at 2 (explaining that Plaintiff "would like to enjoy [her] life, whatever [she has] left of it, to the fullest" but "[cannot] work" so is asking for "what is owed to [her]"). While the Court is sympathetic to Plaintiff's almost-ten-year fight for disability benefits, the ALJ's RFC determination is supported by substantial evidence.

An RFC should account for the most activity a claimant can perform despite the limitations from her disability. 20 C.F.R. § 416.945(a). An ALJ's RFC determination must "be accompanied

---

[9] The GRID Rules apply only to sedentary work. See 20 C.F.R. Pt. 404, Subpt. P, App. 2, §§ 201.27, 201.28 (2005).

[10] While the Plaintiff does not give specific reasons why the Court should reverse the Commissioner's final administrative decision, a liberal reading of her appeal indicates that she cannot do many activities of daily life and therefore cannot be expected to work even at a job that only requires sitting. See ECF No. 15 at 2. The Court construes these assertions as a disagreement with the ALJ's RFC finding that Plaintiff can complete sedentary work with restrictions. See generally Dluhos v. Strasberg, 321 F.3d 365, 369 (3d Cir. 2003) (explaining that a court must liberally construe a pro se Plaintiff's pleadings and apply the applicable law, irrespective of whether the pro se litigant has mentioned it by name).

by a clear and satisfactory explication of the basis on which it rests" to enable judicial review. Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981); see also Harris v. Comm'r of Soc. Sec., No. 09-3219, 2010 WL 2874352, at *6 (D.N.J. July 19, 2010) (explaining that the ALJ must include "a narrative discussion describing how the evidence supports each conclusion" reached). Plaintiff has the burden to demonstrate how any error "could have affected the outcome of [her] disability claim." See Holloman v. Comm'r of Soc. Sec., 639 F. App'x 810, 814 (3d Cir. 2016). While an ALJ is not required to use "particular language or adhere to a particular format in conducting [her] analysis," the Court must ensure there is "sufficient development of the record and explanation of findings to permit meaningful review." Jones, 364 F.3d at 505.

Here, the ALJ supported her RFC determination with a detailed discussion of the medical and non-medical evidence before concluding that Plaintiff was able to perform sedentary work with certain restrictions. The ALJ came to this decision by determining that Plaintiff's cardiac condition "rapidly and dramatically" improved following her cardiac catheterization in 2011. See Tr. 19, 242, 308. After the catheterization, Plaintiff's ejection fraction ratings all remained stable, and her stress tests revealed that Plaintiff could achieve an average exercise capacity at 10.4 METS. See Tr. 21, 242, 307–08, 467, 575, 686, 690. Plaintiff also did not indicate cardiac symptoms to any of her treating physicians, and several physicians characterized her condition as euvolemic. See Tr. 482, 491, 504. In addition, Plaintiff's physicians never prescribed a limitation on normal activities. See Tr. 472, 482, 507, 512, 557, 605. Similarly, the ALJ noted how Plaintiff's COPD and asthma were controlled with medication, Tr. 511, 567, 611, and on the few occasions Plaintiff was treated for respiratory exacerbations associated with upper respiratory infections, she responded well to treatment. Tr. 21, 228–29, 474, 677–78.

Moreover, the ALJ considered Plaintiff's subjective testimony of her symptoms and daily activities and concluded that her testimony surrounding the intensity, persistence and limiting effects of her conditions was not entirely supported by the evidence. Tr. 19. Plaintiff did not produce any relevant medical evidence to support a lower RFC than the sedentary work RFC with substantial restrictions given to her. See Arroyo v. Comm'r of Soc. Sec., 82 F. App'x 765, 768 (3d Cir. 2003) ("While an ALJ should consider an applicant's subjective complaints . . . the applicant bears the burden of producing medical evidence to support those complaints."). Instead, Plaintiff indicated that she could do household chores, help her children with her schoolwork, clean the house, and complete yardwork monthly. Tr. 20–21, 50–51, 150–54. This evidence is consistent with the finding that Plaintiff can perform sedentary work with postural and environmental restrictions during the relevant period for her disability claim from December 16, 2010, through March 31, 2015.

The Court is satisfied that the ALJ considered Plaintiff's testimony regarding her impairments and daily activities, treatment records, and medical opinions, and determined the validity and probative value of the record evidence independently and in combination. Accordingly, the Court finds that the ALJ's decision that Plaintiff was not disabled within the meaning of the Act is supported by substantial evidence.

### B. Plaintiff's Date of Last Insured

Although it is not entirely clear from Plaintiff's submission, Plaintiff also seemingly alleges that she "work[ed] and paid into her Social Security fund until [she] was not able to work again" and therefore the Court should have considered her medical deterioration beyond the date she was last insured. ECF No. 15 at 1. The Court disagrees.

11

To be eligible for disability benefits, a claimant must establish that she was disabled prior to the date she was last insured. Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990); see also Pearson v. Comm'r of Soc. Sec., 839 F. App'x. 684, 688 (3d Cir. 2020) (explaining that a plaintiff bears the burden of establishing that she became disabled "at some point between the onset date of disability and the date that her insurance status expired") (internal quotations and citations omitted). While the Court may consider evidence generated after a claimant's date of last insured, this evidence may only be used to "shed light on [her] condition during the insured period." Pearson, 839 F. App'x. at 688. Evidence generated after a claimant's date of last insured may only be used to "compel the Commissioner to conclude that the claimant's condition during the insured period was as severe as it became after the date last insured." Id.; see Zirnask v. Colvin, 777 F.3d 607, 612 (3d Cir. 2014) (explaining that the ALJ did not err in giving little weight to claimants' mental health examination that was conducted over two years after his date of last insured).

Here, the ALJ considered the medical evidence Plaintiff submitted after her date last insured. See Tr. 21 (noting in her RFC determination that on April 9, 2015, after Plaintiff's date last insured, Plaintiff was diagnosed with mild sleep apnea, and "despite recent complaints of chest pain, there was no evidence that the claimant had any stenosis"); see also id. (further noting that in mid-April 2015, Plaintiff was diagnosed with non-ischemic cardiomyopathy). Plaintiff, however, did not present any medical evidence that would "shed light" on the severity of her conditions during the insured period. In fact, the evidence Plaintiff submitted after the date last insured was fundamentally the same as it was during Plaintiff's time when insured. The only concrete medical evidence Plaintiff presented after her date last insured was more evidence of her sleep apnea and cardiac conditions—which the ALJ already considered when determining her RFC. Plaintiff did not present any new evidence that would allow an ALJ to conclude her

conditions were more severe than when she was insured. As such, the Court finds the ALJ appropriately considered the medical evidence in the record after Plaintiff's last insured status.

### IV. CONCLUSION

For the foregoing reasons, the determination of the Commissioner is **AFFIRMED.**

Date: November 1, 2023

<u>s/ *Madeline Cox Arleo*</u>
**Hon. Madeline Cox Arleo**
UNITED STATES DISTRICT JUDGE